1   MORGAN, LEWIS & BOCKIUS LLP     MCDERMOTT, WILL & EMERY LLP
    Daniel Johnson, Jr., Bar No. 57409     William G. Gaede, III, Bar No. 136184
2   djjohnson@morganlewis.com     wgaede@mwe.com
    One Market, Spear Street Tower     275 Middlefield Road, Suite 100
3   San Francisco, CA  94105-1126     Menlo Park, CA 94025-4004
    Tel:   +1.415.442.1000     Tel:   +1.650.815.7400
4   Fax:   +1.415.442.1001     Fax:   +1.650.815.7401

5   MORGAN, LEWIS & BOCKIUS LLP     MCDERMOTT, WILL & EMERY LLP
    Dion M. Bregman, Bar No. 208393     John C. Low, *Pro Hac Vice* Pending
6   dbregman@morganlewis.com     jlow@mwe.com
    2 Palo Alto Square     1000 Louisiana, Suite 3900
7   3000 El Camino Real, Suite 700     Houston, TX 77002
    Palo Alto, CA  94306     Tel:   +1.713.653.1381
8   Tel:   +1.650.843.4000     Fax:   +1.713.653.1700
    Fax:   +1.650.843.4001

9
    Attorneys for Defendant
10  GENMARK DIAGNOSTICS, INC.

11              UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13
    VIRONOVATIVE B.V., a Dutch          Case No. CV 15-0021 DMS JMA
14  Limited Liability Company,
                                        **DEFENDANT GENMARK**
15              Plaintiff,              **DIAGNOSTICS, INC.'S**
                                        **MEMORANDUM OF POINTS**
16              vs.                     **AND AUTHORITIES IN**
                                        **SUPPORT OF MOTION TO**
17  GENMARK DIAGNOSTICS, INC., a        **DISMISS PLAINTIFF'S**
    Delaware corporation,               **COMPLAINT**
18
                Defendant.              Date:  April 24, 2015
19                                      Time:  1:30 PM
                                        Department:  13A
20                                      Judge Hon. Dana M. Sabraw

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   TECHNOLOGY BACKGROUND ........................................................... 2

III.  STATEMENT OF FACTS ........................................................................ 4

IV.   LEGAL STANDARDS ............................................................................. 7

    A.   Motion to Dismiss ......................................................................... 7

    B.   Section 101 Patentable Subject Matter .......................................... 8

V.    ARGUMENT ......................................................................................... 12

    A.   The '206 Specification Indicates That the Claims Are Directed
        to a Natural Phenomenon or Natural Law – the Presence or
        Absence of hMPV In Humans. .................................................... 12

    B.   Independent Claims 1, 9, and 16 Add Only Conventional and
        Well-Known Steps to a Natural Phenomenon, As Discussed
        Within the Patent Specification ..................................................... 13

    C.   Independent Claims 19 and 28 Recite Well-Known,
        Conventional Steps for Identifying a Natural Phenomenon. .......... 16

    D.   ViroNovative's Dependent Claims Do Not Add Patentable
        Subject Matter .............................................................................. 19

    E.   The '206 Patent Pre-Empts the Use of a Natural Phenomenon ......... 20

    F.   Any Request for Leave to Amend the Complaint Would Be
        Futile. .......................................................................................... 24

VI.   CONCLUSION ...................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*
134 S. Ct. 2347 (2014) ................................................................................ 8, 21

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*
19 F. Supp. 3d 938 (N.D. Cal. 2013) ................................................... 11, 19, 20

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ...................................................................................... 7, 8

*Ass'n for Molecular Pathology, v. Myriad Genetics, Inc.*
133 S. Ct. 2107 (2013) ................................................................................ passim

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ........................................................................................... 7

*Diamond v. Chakrabarty*
447 U.S. 303 (1980) ......................................................................................... 12

*Diamond v. Diehr*
450 U.S. 175 (1981) ........................................................................................... 8

*Genetic Techs. Ltd. v. Agilent Techs., Inc.*
24 F. Supp. 3d 922 (N.D. Cal. 2014) ............................................................... 11

*Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*
Case Nos. 12-394-LPS, 12-396-LPS, 2014 WL 5507637 (D. Del. Oct. 30,
2014) ........................................................................................................... 11, 17

*Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*
Case No. 12-1736-LPS-CJB, 2014 WL 4379587 (D. Del. Sept. 30, 2014) 8, 11, 24

*Harris v. Amgen, Inc.*
770 F.3d 865 (9th Cir. 2014) ............................................................................ 7

*In re BRCA1- and BRCA2-Based Hereditary Cancer Test Patent Litigation*
774 F.3d 755 (Fed. Cir. 2014) .................................................................... passim

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Internet Patents Corp. v. Gen. Auto. Ins. Servs., Inc.*
    29 F. Supp. 3d 1264 (N.D. Cal. 2013) ........................................................................ 24

*Knievel v. ESPN*
    393 F.3d 1068 (9th Cir. 2005)........................................................................ 8

*Kushner v. Beverly Enters., Inc.*
    317 F.3d 820 (8th Cir. 2003)........................................................................ 8

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*
    132 S. Ct. 1289 (2012) ........................................................................ passim

*PerkinElmer, Inc. v. Intema Ltd.*
    496 Fed. Appx. 65 (Fed. Cir. 2012)........................................................................ 11

*Ultramercial, Inc. v. Hulu, LLC*
    772 F.3d 709 (Fed. Cir. 2014)........................................................................ 8

**FEDERAL STATUTES**

35 U.S.C. § 101........................................................................ 8, 9, 24

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6) ........................................................................ 7

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     <u>INTRODUCTION</u>**

3      The Supreme Court, in its recent decisions, has made clear two key principles

4  critical to an understanding of this case: (1) the laws of nature, natural phenomena,

5  and discoveries about the natural world, however interesting or labor-intensive the

6  discovery, are not patentable subject matter; and (2) a method or process based on a

7  natural phenomenon that uses only well-understood, routine and conventional

8  activities, with no additional inventive concept, is not patent eligible.

9      In this case, plaintiff ViroNovative, B.V. ("ViroNovative") claims to have

10  discovered how to detect a type of viral respiratory tract infection in humans.

11  ViroNovative discovered the presence of the virus in archived human samples from

12  as long ago as 1958[1].  Once the existence of this human virus was discovered, this

13  fact is now used to detect the virus in patients, using well known, standard

14  techniques.

15      ViroNovative did not invent any new ways of isolating the virus, it did not

16  invent any new ways of detecting the virus, nor did it invent any new ways of

17  finding or identifying the virus' nucleic acids.  And ViroNovative's patent even

18  admits that once it found the naturally occurring virus, it used well-known,

19  conventional steps in its methods of detecting the virus.  The law is clear that these

20  well-known, conventional steps do not and cannot confer patentability on this basic

21  discovery of a natural phenomenon.

22      As such, ViroNovative's claims clearly fall within the Supreme Court's

23  analysis in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,:

24           [T]he steps in the claimed processes (apart from the
              natural laws themselves) involve well-understood,
25           routine, conventional activity previously engaged in by
              researchers in the field. At the same time, upholding the
26

27  [1] "Analysis of serum samples taken from human in 1958 revealed that MPV has

28  been widespread in the human population for more than 40 years . . . ."  Complaint
     (Dkt. 1) ("Compl."), Ex. A at col. 26:55-59.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries.

132 S. Ct. 1289, 1294 ( 2012).  As such, ViroNovative is not entitled to patent protection for these methods as a matter of law.  The Complaint against GenMark Diagnostics, Inc. ("GenMark") should be dismissed without leave to amend.

## II.     TECHNOLOGY BACKGROUND

This case relates to detecting human *metapneumovirus* ("hMPV"), a virus that causes lower respiratory infections in children and adults.  *See* Compl., ¶ 9.

The Supreme Court's discussion of nucleic acid technology from *Myriad* is a useful tutorial for background explanation.  As stated by the Supreme Court, genes are made of **d**eoxyribo**n**ucleic **a**cid, or DNA, that comprise strings, or sequences, of four different nucleotide bases: adenine (A), thymine (T), cytosine (C) and guanine (G).  *Ass'n for Molecular Pathology, v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2111 (2013).  One strand of DNA forms "cross-bars" with a second, complementary strand of DNA, when As form bonds with Ts, and Gs form bonds with Cs.  *Id*.  Each gene has a different and unique sequence of A, T, C and G.  When the two strands are bonded together to form the double helix, the strands are said to be "hybridized."

The Supreme Court goes on to explain:

> Sequences of DNA nucleotides contain the information necessary to create strings of amino acids, which in turn are used in the body to build proteins.  . . .
>
> Creation of proteins from DNA involves two principal steps, known as transcription and translation. In transcription, the bonds between DNA nucleotides separate, and the DNA helix unwinds into two single strands. A single strand is used as a template to create a complementary ribonucleic acid (RNA) strand. The nucleotides on the DNA strand pair naturally with their counterparts, with the exception that RNA uses the nucleotide base uracil (U) instead of thymine (T). Transcription results in a singles strand RNA molecule, known as pre-RNA, whose nucleotides form an inverse image of the DNA strand from which it was created. . . .

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1

2

3

4

5

6

7

 In translation, cellular structures known as ribosomes read each set of three nucleotides, known as codons, in the mRNA. Each codon either tells the ribosomes which of the 20 possible amino acids to synthesize or provides a stop signal that ends amino acid production.

DNA's informational sequences and the processes that create mRNA, amino acids, and proteins occur naturally within cells. Scientists can, however, extract DNA from cells using well known laboratory methods. These methods allow scientists to isolate specific segments of DNA—for instance, a particular gene or part of a gene—which can then be further studied, manipulated, or used.[2]

8    *Id*. at 2111-12.

9    Essentially, the unique sequence of nucleotides A, T, C and G in a gene leads

10   to a unique amino acid protein sequence.

11   In the patents, the sequences of the nucleic acids and proteins are not recited

12   in the claims, but are identified by sequence identifiers.  That is, the DNA sequence

13   corresponding to the gene that encodes the N-protein is "SEQ ID NO:36," while the

14   protein sequence of the N-protein is "SEQ ID NO:1."

15   The hMPV virus contains genes for eight proteins:  the "N protein[3]," the "P

16   protein," the "M protein," the "F protein," the "M2 protein," the "SH protein," the

17   "G protein," and the "L protein."  *See* Compl., Fig. 1.  At issue in the present case is

18   the gene encoding the N protein.

19   In the present case, the hMPV does not contain DNA, rather, it contains a

20   single strand of **ribo**nucleic **a**cid, RNA,  as the genetic material encoding the viral

21   proteins.  *Id*. at ¶ 10.  However, the process is essentially the same.  In a virus, the

22   RNA is introduced by infection into the patient, and the viral RNA is used to make

23   viral proteins, leading to symptoms.

24   Accordingly, the patent claims are directed to methods of diagnosing hMPV

25   infections by detecting the genetic material of hMPV.  If the hMPV genetic

26

27   [2] The Supreme Court discussion of "introns" and "exons" has been omitted, as hMPV does not contain either.

28   [3] "N protein" stands for "nucleocapsid protein."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1    material is present, the patient has the infection and treatment can then proceed.

2       The hMPV virus is a "package" of viral proteins that contains RNA.  *Id*. at

3    Fig. 1.  The virus is isolated from a patient, either out of blood or from nasal swabs

4    and the hMPV genetic material is collected, using well known techniques.  *See*

5    Compl., Ex. A at col. 26:1-2, 62-64.  The genetic material is then manipulated, for

6    example as shown in Figure 2 of the Complaint, using well known traditional

7    techniques, to create multiple copies of the hMPV genetic material.  This

8    multiplication step is referred to as "amplification"[4] and is done using smaller

9    pieces of nucleic acids called "primers," that will "hybridize" (e.g. bond) to the

10   larger hMPV sequence and will make copies of the hMPV sequence.

11      One such well-known method is the use of reverse-transcriptase polymerase

12   chain reaction (RT-PCR), which converts an isolated, single-stranded RNA

13   molecule into a double-stranded complementary DNA molecule by using primers to

14   create more DNA copies of the nucleic acid sequence.  *Id*. at ¶ 11, Fig. 2.

15      Once the amplification has occurred, the resulting hMPV genetic material

16   can optionally be "hybridized" to another smaller piece of hMPV nucleic acid,

17   sometimes referred to as a "probe," for detection.

18      Once the naturally occurring gene sequence is known, that information is

19   used to design additional pieces of nucleic acids (*e.g.* "probes" or "primers") to

20   facilitate detection.

21   ## III.   STATEMENT OF FACTS

22      ViroNovative asserts infringement of U.S. Patent No. 8,927,206 B2 (the '206

23   patent), titled "Virus Causing Respiratory Tract Illness in Susceptible Mammals."

24   hMPV is a virus that causes lower respiratory infections in children and adults.

25   Compl., ¶ 9.  hMPV is referred to as a negative-sense, single-stranded RNA virus,

26   with an RNA genome that encodes (or contains the genetic information for) eight

27

28

---

[4] *See* Compl., ¶11.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1  different proteins.  *Id.* at ¶ 10.

2        All claims of the '206 patent are method claims, with claims 1, 9, 16, 19 and

3  28 being independent claims.  Claims 1 through 18 recite similar limitations and,

4  briefly, claim methods of diagnosing hMPV by reacting a sample with a DNA

5  sequence that will hybridize to the virus' nucleotide sequence.  The reaction of the

6  patient sample with a smaller piece of hMPV nucleic acid is indicative of the

7  presence of the virus from the subject.

8        The remaining claims, claims 19 through 28, recite methods for detecting

9  polynucleotides from hMPV by performing nucleic acid amplification and

10  hybridizing the amplification product to detect the virus.  Claim 1 of the '206 patent

11  recites:

12            1.  A method for identifying a viral isolate from a
            mammalian subject as comprising a human
13            *metapneumovirus*, the method comprising:

14            reacting the viral isolate or a compound thereof with a
            DNA molecule of at least 10 nucleotides in length that is
15            at least 90% homologous to a stretch of the DNA
            sequence of SEQ ID NO: 36, or the complement thereof;
16
            wherein the reaction of the DNA molecule with the viral
17            isolate or component thereof indicates the presence of
            human *metapneumovirus* in the viral isolate from the
18            mammalian subject.

19
20  Compl., Ex. A at col. 223:2-13.  "SEQ ID NO: 36" is a DNA sequence that encodes

21  the N-protein of hMPV.[5]  *Id.* at cols. 127-132 (sequence listing).

22        The claims that depend from claim 1 recite reacting the viral isolate with

23  DNA molecules of different lengths, or DNA molecules that are homologous to a

24  specific stretch of SEQ ID NO:36.  Claim 7 further recites that the DNA molecule

25  comprises SEQ ID NO: 122, which is an 18-base probe.  *Id.* at col. 30:33-34

26  (sequence listing).  Claim 8 allows for the formation of a complex between the

27  DNA molecule and the DNA sequence.

28  _____

[5] It should be noted that the patent does not recite any RNA sequences of hMPV.

Independent claims 9 and 16, and the claims that depend from them, are similar to claim 1 and its dependents.  Claim 9 recites a method for diagnosing a hMPV infection, using steps similar to claim 1.  *Id.* at col. 223:41-51.  Claim 16 similarly recites a method for diagnosing hMPV infection in a mammal, by reacting the sample with a DNA molecule specifically reactive with a stretch of at least 10 nucleotides of the DNA sequence of SEQ ID NO:36.  *Id.* at col. 224:8-18.

Independent claim 19 is typical of the second group of claims, and recites:

> 19.    A method of detecting if a polynucleotide from a human *metapneumovirus* is present in a mammalian subject, the method comprising:
>
> performing an nucleic acid amplification reaction on a sample derived from the mammalian subject utilizing a set of primers for the amplification of at least a portion of the N gene of human *metapneumovirus* to create an amplified product, wherein the N gene, when transcribed and translated, produces a polypeptide at least 90% homologous to SEQ ID NO:1;
>
> contacting the amplified product with a DNA molecule that hybridizes with the amplified product;
>
> hybridizing the DNA molecule to the amplified product;
>
> detecting the hybridized DNA molecule;
>
> wherein the detection of the hybridized DNA molecule indicates the presence of human *metapneumovirus* in the mammalian subject.

*Id.* at col. 224:25-42.  SEQ ID NO: 1 is the amino acid sequence of the N-protein of hMPV.  *Id.* at cols. 65-68 (sequence listing).

According to ViroNovative, claim 19 describes a process of amplifying nucleic acids that are "*specifically* associated with hMPV," namely, the "N" gene of hMPV.  Compl., ¶ 16. Dependent claims 20, 21, and 24-27 recite DNA molecules of different lengths, DNA molecules that hybridize to specific portions of the N gene, well-known types of amplification reactions, labels on the DNA molecules, and their detection.

Claim 22 recites that the DNA molecule comprises SEQ ID NO: 122, which

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1  is a hybridization probe of 18 bases.  Claim 23 recites that the primers comprise

2  SEQ ID NOs: 113 and 114, which are artificial primers of 20 and 22 bases,

3  respectively.

4        Independent claim 28 is similar to claim 19, but recites the narrower step of

5  "contacting the amplified product with a DNA molecule of at least 25 nucleotides

6  in length that specifically hybridizes with the amplified product."  *See* Compl.,

7  ¶¶ 15, 26.

8        GenMark manufactures, sells, and markets the eSensor® respiratory viral

9  panel (RVP) product, which ViroNovative asserts "is marketed as offering

10  comprehensive detection of 14 respiratory virus types and subtypes, including

11  hMPV."  *Id*. at ¶ 8; *see also* ¶ 17.

12  **IV.**  **LEGAL STANDARDS**

13       **A.**  **Motion to Dismiss**

14        A court must dismiss a complaint under Federal Rule of Civil Procedure

15  12(b)(6) if it fails to set forth "enough facts to state a claim to relief that is plausible

16  on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has

17  facial plausibility when the plaintiff pleads factual content that allows the court to

18  draw the reasonable inference that the defendant is liable for the misconduct

19  alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Further, "the tenet that a

20  court must accept as true all of the allegations contained in a complaint is

21  inapplicable to legal conclusions," as well as conclusions that are contradicted by

22  documents incorporated into the complaint.  *Id*. at 663 (citing *Twombly*).

23        In deciding a motion to dismiss, a court "must consider the complaint in its

24  entirety, as well as other sources courts ordinarily examine when ruling on Rule

25  12(b)(6) motions to dismiss, in particular, documents incorporated into the

26  complaint by reference, and matters of which a court may take judicial notice."

27  *Harris v. Amgen, Inc.*, 770 F.3d 865, 874 (9th Cir. 2014) (quoting *Tellabs, Inc. v.*

28  *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 332 (2007)).  The court then determines

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1  whether the allegations in the complaint "plausibly suggest an entitlement to relief."

2  *Iqbal*, 556 U.S. at 681.  The court may also rely on documents "whose contents are

3  alleged in a complaint and whose authenticity no party questions, but which are not

4  physically attached to the [plaintiff's] pleading."  *Kushner v. Beverly Enters., Inc.*,

5  317 F.3d 820, 831 (8th Cir. 2003) (citing *In re Syntex Corp. Sec. Litig.,* 95 F.3d

6  922, 926 (9th Cir. 1996)) (internal quotations omitted).  If a plaintiff's claim

7  depends on a document's contents, or is central to the complaint, the court can

8  consider it.  *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).

9        Absent identifiable factual disputes, patent-eligible subject matter is suitable

10  for resolution on a motion to dismiss.  *See, e.g.*, *Ultramercial, Inc. v. Hulu, LLC*,

11  772 F.3d 709, 714-15 (Fed. Cir. 2014) (upholding district court decision to grant

12  motion to dismiss based on no patentable subject matter); *Genetic Techs. Ltd. v.*

13  *Lab. Corp. of Am. Holdings,* Case No. 12-1736-LPS-CJB, 2014 WL 4379587 (D.

14  Del. Sept. 3, 2014).

15        **B.     Section 101 Patentable Subject Matter**

16        Pursuant to 35 U.S.C. § 101, an applicant may obtain a patent on any new

17  and useful process, machine, manufacture, composition of matter, or useful

18  improvement thereof.  The Supreme Court has consistently held that "law of nature,

19  natural phenomena, and abstract ideas" are not patentable.  *Diamond v. Diehr*, 450

20  U.S. 175, 185 (1981); *see also Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct.

21  2347, 2354 (2014); *Prometheus*, 132 S. Ct. at 1293.

22        A two-step approach is used to determine whether claims recite patentable

23  subject matter.  First, a court must determine whether the claims at issue are

24  directed to a patent-ineligible concept, such as laws of nature, natural phenomenon,

25  and abstract ideas.  *See Alice Corp.*, 134 S. Ct. at 2355; *Prometheus*, 132 S. Ct. at

26  1296.  If so, the Court considers the elements of each claim both individually and as

27  an ordered combination to determine whether the additional elements transform the

28  nature of the claims into patent-eligible subject matter.  *See id.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

At the second step, the court examines whether a process focusing upon the "use of a natural law also contain[s] other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Prometheus*, 132 S. Ct. at 1294.  If the additional steps in the claimed process, apart from the natural laws themselves, involve only "well-understood, routine, conventional activity previously engaged in by researchers in the field" at the relevant time, they are insufficient to confer patent-eligible subject matter.  *Id.*

For example, in the *Prometheus* decision, the Supreme Court found that the patent at issue claimed laws of nature, specifically, the relationships between concentrations of thiopurine metabolite in the blood and the likelihood that a given dosage of a thiopurine drug would prove effective or harm the patient, and that "the relation itself exists in principle apart from any human action."  *Id.* at 1296-97. With respect to the claims' additional steps, the Supreme Court found that:

> the three steps simply tell doctors to gather data from which they may draw an inference in light of the correlations.  To put the matter more succinctly, the claims inform a relevant audience about certain laws of nature; any additional steps consist of well-understood, routine, conventional activity already engaged in by the scientific community; and those steps, when viewed as a whole, add nothing significant beyond the sum of their parts taken separately.

*Id.* at 1298.

In *Myriad*, the Supreme Court found that claims directed to genes associated with increased breast cancer risk were not patentable subject matter.  133 S. Ct. at 2118.  As the Supreme Court noted, "[g]roundbreaking, innovative, or even brilliant discovery does not by itself satisfy the § 101 inquiry."  *Id.* at 2117. Myriad's efforts were merely an iterative process of discovering a natural phenomenon, and then examining genetic sequences to find that phenomenon.  *See id.*  The claims directed to the sequences themselves were "concerned primarily with the information contained in the genetic *sequence*, not with the specific

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

chemical composition of a particular molecule." *Id.* at 2118.  The *Myriad* decision specifically did not address method claims, but the "processes used by Myriad to isolate DNA were well understood by geneticists at the time of Myriad's patents . . . and fairly uniform insofar as any scientist engaged in the search for a gene would likely have used a similar approach . . . ." *Id.* at 2119-20 (citations omitted).

In another case the Federal Circuit found the method claims ineligible because they merely covered the abstract idea of comparing wild-type genetic sequences with the subject's genetic sequence.  *In re BRCA1- and BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755, 763 (Fed. Cir. 2014).  Relying on *Myriad*, it held that:

> the comparisons described in the first paragraphs of claims 7 and 8 are directed to the patent-ineligible abstract idea of comparing BRCA sequences and determining the existence of alterations. The methods, directed to identification of alterations of the gene, require merely comparing the patient's gene with the wild-type and identifying any differences that arise.

*Id.*  Exemplary claims that were invalidated in *In re BRCA1- and BRCA2-* include Claims 7 and 8 of U.S. Patent No. 5,753,441 (Claim 1 shown for dependency):

> 1. A method for screening germline of a human subject for an alteration of a BRCA1 gene which comprises comparing germline sequence of a BRCA1 gene or BRCA1 RNA from a tissue sample from said subject or a sequence of BRCA1 cDNA made from mRNA from said sample with germline sequences of wild-type BRCA1 gene, wild-type BRCA1 RNA or wild-type BRCA1 cDNA, wherein a difference in the sequence of the BRCA1 gene, BRCA1 RNA or BRCA1 cDNA of the subject from wild-type indicates an alteration in the BRCA1 gene in said subject.

> 7. The method of claim 1 wherein a germline nucleic acid sequence is **compared by hybridizing a BRCA1 gene probe** which specifically hybridizes to a BRCA1 allele to genomic DNA isolated from said sample and **detecting the presence of a hybridization product wherein a presence of said product indicates the presence of said allele in the subject.**  (Emphasis added).

> 8. The method of claim 1 wherein a germline nucleic acid sequence is compared **by amplifying all or part of a BRCA1 gene from said sample using a set of primers**

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1

to produce amplified nucleic acids and sequencing the amplified nucleic acids.  (Emphasis added).

2

*Id.* at 761.

3

  The Federal Circuit expressly stated that the additional steps of hybridization

4

and amplification recited in the dependent claims "do nothing more than spell out

5

what practitioners already knew – how to compare gene sequences using routine,

6

ordinary techniques."  *Id.* at 764.

7

  In *PerkinElmer, Inc. v. Intema Ltd.*, 496 Fed. Appx. 65, 71-72 (Fed. Cir.

8

2012), the Federal Circuit held that a correlation between increased risk of fetal

9

Down's syndrome with certain analytical screening markers was a natural law,

10

unsuitable for patent protection.  The "measuring" and "determining" steps added

11

to that natural law were insufficient to make the claims patent eligible.  *Id.* at 71.

12

  At the district court level, the Northern District of California has held that the

13

correlation between cell-free-fetal DNA in maternal plasma or serum with sex,

14

blood type, and certain genotypes was a law of nature, and thus unpatentable.

15

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 19 F. Supp. 3d 938, 948-50 (N.D. Cal.

16

2013).  The District of Delaware held that the correlation between non-coding DNA

17

and certain alleles likewise is a natural law, and in turn, not patentable subject

18

matter.  *Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, Case Nos. 12-394-LPS,

19

12-396-LPS, 2014 WL 5507637, at *6-7 (D. Del. Oct. 30, 2014); *see also Genetic*

20

*Techs. Ltd. v. Lab. Corp*, 2014 WL 4379587, at *10-11 (holding that correlation

21

between presence of two copies of 577R allele and potential sprinting performance

22

was an unpatentable natural law); *but see Genetic Techs. Ltd. v. Agilent Techs.,*

23

*Inc.*, 24 F. Supp. 3d 922, 928-30 (N.D. Cal. 2014) (holding that correlation between

24

non-coding DNA and alleles was a natural law, but failing to find clear and

25

convincing evidence that there was no "inventive concept").

26

  In short, numerous courts have consistently held that, where patent claims

27

recite merely a natural law, plus some well-known method steps, those claims are

28

not patentable.  This Court should follow the above precedent and dismiss the current action with prejudice.

## V.    ARGUMENT

The '206 Patent claims only a natural phenomenon or natural law:  if the nucleotide sequence for hMPV is present in a mammal, the virus itself is present in a mammal.  The additional steps to the process add only well-understood, routine, conventional activities, such as PCR amplification, hybridization, and the use of labels, to this principle.

### A.    The '206 Specification Indicates That the Claims Are Directed to a Natural Phenomenon or Natural Law – the Presence or Absence of hMPV In Humans.

The claims of the '206 patent are directed to a natural phenomenon or natural law – that the presence of hMPV nucleic acids in humans indicates the presence of hMPV itself in a human or mammal.  While it may be significant, this natural phenomenon is no more patentable than Newton's law of gravity or Einstein's mass-energy equivalence.  *See Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980); *Prometheus*, 132 S. Ct. at 1297:

> The relation [between metabolites and the dosage of a thiopurine drug] is a consequence of the ways in which thiopurine compounds are metabolized by the body— entirely natural processes.  And so a patent that simply describes that relation sets forth a natural law.

The natural phenomenon on which the '206 patent is based is merely finding, isolating and classifying hMPV based on its nucleic acid sequence.  As the patentees admit, hMPV had been found in humans for over 40 years.  Compl., Ex. A at col. 23:45-59 ("From 1980 till 2000 we found 28 unidentified virus isolates from patients with severe Respiratory disease.");  col. 26:1-4 ("IFA conducted with 72 sera taken from humans in 1958 (ages ranging from 8-99 years)[12, 27] revealed a 100% seroprevalence, indicating the virus has been circulating in the human population for more than 40 years.").  This is obviously a discovery, not an

invention.  Thus, clearly, the presence of hMPV in humans is a naturally occurring phenomenon.

Similarly, if one can detect the nucleotide sequence of the hMPV, the virus is present, and vice versa.  For example, independent claim 1 recites a method for identifying a viral isolate from a mammalian subject as comprising an hMPV, including reacting the viral isolate with a DNA molecule that shares a nucleotide sequence with an identified sequence.  Independent claim 19 claims a method of detecting if a polynucleotide from hMPV is present by amplifying a sequence from the N gene of the hMPV, and hybridizing it with a DNA molecule.  In short, the basis of the '206 patent is an unpatentable discovery about the natural world.

### B.   Independent Claims 1, 9, and 16 Add Only Conventional and Well-Known Steps to a Natural Phenomenon, As Discussed Within the Patent Specification

The '206 patent specification admits that it adds only a few well-known, conventional steps to a natural phenomenon.  *See Prometheus,* 132 S. Ct. at 1297.  The first step of claim 1 recites "reacting the viral isolate or a component thereof with a DNA molecule of at least 10 nucleotides in length that is at least 90% homologous to a stretch of the DNA sequence of SEQ ID No: 36, or the complement thereof."  Compl., Ex. A at col. 223:5-8.  First, this step requires providing a viral isolate.  The specification contains numerous admissions that this step is conventional and well known:

> Analysis of serum samples taken from humans in 1958 revealed that MPV has been widespread in the human population . . .

> Over the past decades our laboratory has collected nasopharyngeal aspirates from children suffering from RTI, which are routinely tested for the presence of viruses.

*Id.* at col. 26:1-6, 55-62, 62-64; col. 27:16-18.  Since the viral isolation is done "routinely," this supports that the technique is well-known and conventional.

That hMPV is an RNA virus, and its isolation may require isolating the virus'

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

RNA also does not make this subject matter patentable.  Indeed, the specification admits that this step is not only well-known, but can be done using a kit obtained from a manufacturer:

> RNA was isolated from the supernatant of infected cell cultures or sucrose gradient fractions **using a High Pure RNA Isolation kit** according to instructions from the manufacturer (Roche Diagnostics, Almere, The Netherlands)."

*Id*. at col. 29:2-5 (emphasis added).  Indeed, the use of a commercially available kit to accomplish a step supports a finding that the step is conventional.

The claim next requires "reacting the viral isolate . . . with a DNA molecule . . . ."  *Id*. at col. 223:5-6.  The Patentees state that this step is similarly conventional, and is done according to well-known techniques such as PCR:

> The method is useful in a method for virologically diagnosing an MPV infection of a mammal, said method for example comprising determining in a sample of said mammal the presence of a viral isolate or component thereof **by reacting said sample with a nucleic acid** or an antibody according to the invention. Examples are further given in the detailed description, **such as the use of PCR (or other amplification or hybridization techniques well known in the art)** or the use of immunofluorescence detection (or other immunological techniques known in the art).

*Id*. at col. 17:61-18:3 (emphases added).  The step of reacting the viral isolate with a DNA molecule is so conventional that it can be done using a commercially-available kit:

> The invention also provides a diagnostic kit for diagnosing an MPV infection comprising an MPV, an MPV-specific nucleic acid, proteinaceous molecule or fragment thereof, antigen and/or an antibody according to the invention, and **preferably a means for detecting said MPV**, MPV-specific nucleic acid, proteinaceous molecule or fragment thereof, antigen and/or an antibody, **said means for example comprising an excitable group such as a fluorophore or enzymatic detection system used in the art (examples of suitable diagnostic kit format comprise** IF, ELISA, neutralization assay, **RT-PCR assay).**

*Id*. at col. 3:49-58 (emphases added).  Through the above statements, the Patentees

have admitted that these techniques are conventional and well understood.

This limitation of claim 1 next requires reacting the viral isolate with a DNA molecule of at least 10 nucleotides in length that is at least 90% homologous to a stretch of the of the DNA sequence of SEQ ID NO: 36, or with its complement. Importantly, this claim ***does not*** claim the DNA molecule itself, instead it claims a method that uses it.  As such, the claim must be analyzed under the *Prometheus* standards and not *Myriad*.   Further, in *In Re BRCA1- and BRCA2-*, the Federal Circuit held  that method claims reciting nucleic acid hybridization or amplification steps were not patent-eligible, explaining that:

> [n]othing is added by identifying the techniques to be used in making the comparison because those comparison techniques were the well-understood, routine, and conventional techniques that a scientist would have thought of when instructed to compare two gene sequences.

774 F.3d at 764.  So too here, where ViroNovative merely claims the detection of the virus using a nucleic acid sequence.

And, to the extent that other methods, such as different types of PCR, are implied in claim 1, various sections in the patent specification refer to articles or other sources for methods used in the invention.  For example, "[t]o obtain sequence information on the unknown virus isolates, we used a random PCR amplification strategy known as RAP-PCR.[10]"  Compl., Ex. A at col. 24:34-36. "RAP-PCR was performed essentially as described.[10]"  *Id.* at col. 29:20.   Footnote 10 refers to an article published in 1992, titled "Arbitrarily primed PCR fingerprinting of RNA."  *Id.* at 47:47-50.  Descriptions of RT-PCR, diagnostic PCR, and sequence analysis are also included.  *Id*. at col. 33:2-51.  For example, the specification states that "[a]ll techniques were performed according to the instructions of the manufacturer."  *Id.* at col. 33:30-31.  Similarly, commercially available kits are stated to be used "according to instructions from the manufacturer."  *Id.* at col. 45:48-56.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

The second limitation of Claim 1 likewise does not indicate patentable subject matter, and instead only recites "wherein the reaction of the DNA molecule with the viral isolate or component thereof indicates the presence of human *metapneumovirus* in the viral isolate from the mammalian subject." Compl., Ex. A at col. 223:9-13. This step merely recites the correlation between the virus' nucleic acid sequence and the virus itself and the mental processes to make that connection – nothing more. It cannot add sufficient steps to indicate patentable subject matter. *See Prometheus*, 132 S. Ct. at 1296.

Independent claims 9 and 16 fare no better than claim 1. Claim 9 adds the element of "determining in a sample of the mammal the presence of a component of human *metapneumovirus* . . ." Compl., Ex. A at col. 223:43-44. This merely adds a mental step to claim 1. Claim 16 adds the element of "reacting the sample with a DNA molecule ***specifically reactive*** with a stretch of at least 10 nucleotides of the DNA sequence of SEQ ID No: 36 . . ." *Id.* at col. 224:12-14. As with the other independent claims, this merely describes another well-known, routine, and conventional way of detecting the natural phenomenon.

### C.   Independent Claims 19 and 28 Recite Well-Known, Conventional Steps for Identifying a Natural Phenomenon.

As with the other independent claims, claims 19 and 28 merely recite a natural phenomenon, coupled with well-known, conventional steps for detecting and identifying that phenomenon. Claim 19 first requires:

> performing an nucleic acid amplification reaction on a sample derived from a mammalian subject utilizing a set of primers for the amplification of at least a portion of the N gene of the human *metapneumovirus* to create an amplified product, wherein the N gene, when transcribed and translated, produced a polypeptide at least 90% homologous to SEQ ID No: 1;

Compl., Ex. A at col. 224:28-34.

First, as described above, nucleic acid amplification reactions were commonly known in the art at the time of the invention, and the specification

admits as much.  The patentees described using commercially available kits to perform RT-PCR or RAP-PCR.  *See supra*, Sect. V.B.

Next, the use of specific primers for the amplification reaction does not confer patentable subject matter.  *See In re BRCA1- and BRCA2-*, 774 F.3d at 760.

As with other sequences recited in these method claims, the claims do not cover the specific sequences themselves, only a method of using them.  *See Myriad*, 133 S. Ct. at 2118.  As noted above, the Federal Circuit in *In re BRCA1- and BRCA2-* has invalidated claim 8 of U.S. Patent No. 5,753,441, noting that amplifying all or part of a gene using a set of primers "do[es] nothing more than spell out what practitioners already knew – how to compare gene sequences using routine, ordinary techniques."  774 F.3d at 764.  And as one court has noted, the use of a specific primer pair to amplify a specific genetic sequence of interest does not limit the claims enough to indicate patentable subject matter.  *See Genetic Techs., v. Bristol-Myers*, 2014 WL 5507637, at *9-10.  Nor does specificity to the virus' N gene limit the claims sufficiently.  As ViroNovative admits, the N gene is simply a part of the hMPV genome.  *See* Compl., ¶¶ 10-11.  In this way, it is merely another part of a natural phenomenon.

The next two limitations of claim 19 recite "contacting the amplified products with a DNA molecule that hybridizes with the amplified product" and "hybridizing the DNA molecule to the amplified product."  Compl., Ex. A at col. 224:35-37.  These steps are not sufficient to add patentable subject matter either, as the Federal Circuit has held in *In re BRCA1- and BRCA2-*, when they invalidated claim 7 of U.S. Patent No. 5,753,441:

> The method of claim 1 wherein a germline nucleic acid sequence is compared by hybridizing a BRCA1 gene probe which specifically hybridizes to a BRCA1 allele to genomic DNA isolated from said sample and detecting the presence of a hybridization product wherein a presence of said product indicates the presence of said allele in the subject.

*See In re BRCA1- and BRCA2-,* 774 F.3d at 761.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1   Claim 19 simply recites well-known steps involved in PCR reactions, and

2   natural phenomenon.

3   The next method step requires "detecting the hybridized DNA molecule,"

4   without specifying any method for doing so. *Id.* at col. 224:39. The specification

5   admits, however, that techniques for detecting hybridized DNA molecules were

6   well-known in the art. Specifically, the '206 patent describes including:

7   a means for detecting same MPV . . . said means for
    example comprising an excitable group such as a
8   fluorophore or enzymatic detection system used in the art
    (examples of suitable diagnostic kit format comprise IF,
9   ELISA, neutralization assay, RT-PCR assay).

10  *Id.* at col. 3:53-58. The '206 patent thus acknowledges that detection methods were

11  known in the art.

12  Finally, claim 19 recites the unpatentable, natural phenomenon – the

13  correlation between the virus' nucleic acids, and the virus itself. *See id.* at col.

14  224:40-42 ("wherein the detection of the hybridized DNA molecule indicates the

15  presence of human *metapneumovirus* in the mammalian subject."). As shown

16  above, claim 19 does not recite patentable subject matter.

17  Claim 28, similar to claim 19, fares no better. Claim 28 adds the limitation

18  "contacting the amplified product with a DNA molecule *of at least 25 nucleotides*

19  *in length* that specifically hybridizes with the amplified product." *Id.* at col. 225:3-

20  5 (emphasis added); Compl., ¶ 15 (pointing out that "[t]he only difference between

21  claims 19 and 28 is that claim 28 recites" the emphasized language above). This

22  language merely puts a lower limit on the size of the DNA molecule used to detect

23  the hMPV nucleic acids – that it can use a DNA molecule that encompasses any 25

24  nucleotides of the genetic information of the hMPV N protein. It does not add

25  patentable subject matter to the claims. *See*, *e.g.*, *In re BRCA1- and BRCA2-*, 774

26  F.3d at 764 (limitations within claims simply identify techniques for comparison of

27  gene sequences and do not add anything because the techniques were well-

28  understood, routine, and conventional).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

### D.   ViroNovative's Dependent Claims Do Not Add Patentable Subject Matter

ViroNovative cannot rely on the dependent claims of the '206 patent to recite patentable subject matter.  The dependent claims add only limitations on the size of the nucleic acids used to detect hMPV, or give more specificity on the well-known, conventional techniques used in the methods.

First, a number of dependent claims merely recite minimum size limitations for the DNA molecule used to detect hMPV.  For example, claim 2 recites "wherein the DNA molecule that is at least 90% homologous is at least 18 nucleotides in length."  Compl., Ex. A at col. 223:14-15, *see also* claims 4 ("at least 25 nucleotides in length"), 10 ("at least 18 nucleotides"), 12 ("at least 25 nucleotides"), 17 ("at least 18 nucleotides"), 18 ("at least 25 nucleotides"), 20 ("wherein the DNA molecule is at least 10 bases in length"), and 21 ("at least 40 bases") at cols. 223: 22-24, 52-54, 60-62; 224:19-24, 43-46.  These limitations merely add to conventional techniques by stating that the DNA molecule must be a certain number of nucleotides long.  *See*, *e.g.*, *Sequenom*, 19 F. Supp. 3d at 949 n.5 (no patentable subject matter where certain dependent claims limited a natural phenomenon to specific types of that natural phenomenon); *see also Myriad*, 133 S. Ct. at 2113 (finding no patentable subject matter in claim 5 of the '282 patent, reciting "[a]n isolated DNA having at least 15 nucleotides of the DNA of claim 1").

Second, several other dependent claims are targeted to a specific portion of the hMPV genome.  For example, claim 3 recites:

> wherein the DNA molecule of at least 18 nucleotides in length is at least 90% homologous to a stretch of nucleotides in bases 27-1277 of DNA sequence of SEQ ID NO: 36, or the complement thereof.

*Id.* at col. 223:17-21.[6] These claims merely limit the search to a smaller portion of the hMPV genome, and do not make the subject matter patentable.  *See*, *e.g.*,

---

[6] *See also* claims 5, 6, 11, 13, 14 and 24.  Compl., Ex. A at cols. 223-224.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

1   *Sequenom*, 19 F. Supp. 3d at 949 n.5; *see also Myriad*, 133 S. Ct. at 2113.

2   Still other claims recite that the DNA molecule, or the primers comprise

3   specific sequences, but these claims fare no better than the others.  For example,

4   claim 7 recites "wherein the DNA molecule comprises SEQ ID NO: 122."  Compl.,

5   Ex. A at col. 223:35-36; *see also* claims 15 and 22 at col. 224:6-7, 47-48.  Claim 23

6   similarly recites "wherein the set of primers comprises SEQ ID NOs: 113 and 114."

7   *Id.* at col. 224:49-50.  Notably, these claims do not recite the sequences themselves

8   – only methods that use them.  Accordingly, they do not recite patentable subject

9   matter.

10   The remainder of the dependent claims recite natural phenomena or

11   additional common steps, yet still do not recite patentable subject matter.  Claim 8

12   requires "further comprising allowing the foimation [sic] of a complex comprising

13   the DNA molecule of at least 10 nucleotides and the DNA sequence, or the

14   complement thereof and detecting the complex."  *Id.* at col. 223:37-40.  As

15   described above, forming and detecting the complex is a step recited in other

16   claims, and is a common, well-known method step in detecting nucleic acids.

17   Claims 25, 26 and 27 recite specific types of nucleic acid reactions (PCR, RAP and

18   RT-PCR), using labeled DNA molecules, and detecting a hybridized complex,

19   respectively.  *Id*. at col. 224:53-59.  The specification of the '206 patent identifies

20   each of these limitations as a well-known or common step.  *Id.* at col. 3:55-58

21   ("said means for example comprising an excitable group such as a fluorophore or

22   enzymatic detection system used in the art (examples of suitable diagnostic kit

23   format comprise IF, ELISA, neutralization assay, RT-PCR assay."); col. 33:27-31

24   ("Sequence analyses were performed using Dyenamic ET terminator sequencing kit

25   . . . and an ABI 373 automatic DNA sequencer . . . . All techniques were performed

26   according to the instructions from the manufacturer." ).

27   **E.    The '206 Patent Pre-Empts the Use of a Natural Phenomenon**

28   Separate and apart from the tests laid out for patentable subject matter in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

*Alice* and *Prometheus*, the '206 patent claims raise another concern: as issued, they pre-empt the use of a natural phenomenon. In *Prometheus*, the Supreme Court expressed the concern that, because the patent claims covered a natural law, upholding them "risk[ed] disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries." 132 S. Ct. at 1294. Further:

> the grant of patents that tie up their [natural laws'] use will inhibit future innovation premised upon them, a danger that becomes acute when a patented process amounts to no more than an instruction to 'apply the natural law,' or otherwise forecloses more future invention than the underlying discovery could reasonably justify

*Id*. at 1301. As applied to the facts of *Prometheus*, the patent claims inhibit the doctors' subsequent treatment decisions, and could potentially inhibit others from developing more refined treatments. *Id*. at 1302.

The Supreme Court reiterated this concern in *Myriad* when considering isolated BRCA1 and BRCA2 genes. *Myriad*, 133 S. Ct. at 2113-14. It expressed the fear that Myriad would have exclusive rights to all uses of the BRCA1 and BRCA2 genes, later inhibiting others' ability to develop and conduct important genetic testing. *Id*.

Similarly, the Federal Circuit noted, when considering method claims drawn to detection of BRCA1 and BRCA2, that granting a patent on comparing "wild-type" to patient's gene sequences would foreclose others from doing further research into the BRCA1 and BRCA2 genes:

> Similar concerns to the ones the Supreme Court expressed in Myriad with respect to isolated DNA exist here: allowing a patent on the comparison step could impede a great swath of research relating to the BRCA genes, and it is antithetical to the patent laws to allow these basic building blocks of scientific research to be monopolized.

*In re BRCA1- and BRCA2-*, 774 F.3d at 764.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

A similar concern exists here with ViroNovative's asserted patent. The '206 patent claims pre-empt the use of hMPV nucleic acids to detect hMPV for the broader claims, and the use of the N-protein and corresponding nucleic acids of hMPV for diagnosis for the narrower claims. ViroNovative has essentially set up a road block for anyone wanting to detect, investigate, or do further research on hMPV. This is exactly what *Myriad* and *Prometheus* warned against.

That the claims are arguably narrower than the entire genome does not alleviate the concern with preemption. ViroNovative has specifically targeted the most useful portion of the hMPV genome for diagnostic purposes, and the specification of the '206 patent admits as much. The entire genome of hMPV is 13,378 nucleotides in length, and codes for multiple proteins (*see* '206 patent, Fig. 7, col. 38:3-39). Claims 1-18 rely on homology to SEQ ID NO: 36, a DNA sequence of about 4700 nucleotides that codes for the N, P, M and F gene, leaving the M2, SH, G, and L genes unclaimed; and claims 19-28 rely on the N gene of hMPV, leaving the genes for the other proteins unclaimed. *See* Compl., Ex. A at cols. 127-132 (describing SEQ ID No: 36); *see also* Compl., ¶¶ 10, 11, Fig. 1 (showing structure of hMPV genome and proteins it encodes).

The specification itself indicates that the N gene (and in turn, SEQ ID NO: 36) are the portions of the genome most likely to yield useful diagnostic results. The '206 patent explains that it is best to use reagents and probes that are the most specific for a particular virus:

> In virology, it is most advisory that diagnosis and/or treatment of a specific viral infection is performed with reagents that are most specific for said specific virus causing said infection. In this case this means that it is preferred that said diagnosis and/or treatment of an MPV infection is performed with reagents that are most specific for MPV.

Compl., Ex. A at col. 2:54-60 (emphasis added). Furthermore, the '206 patent specification explains that it is advantageous to use the portions of the genome that are the most similar across different strains of the same virus:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

> For nucleic aciddetection [sic], it is even more straightforward, instead of designing primers or probes based on heterologous nucleic acid sequences of the various viruses and thus that detect differences between the essentially mammalian or avian *Metapneumovirus*es, <u>it suffices to design or select primers or probes based on those stretches of virus-specific nucleic acid sequences that show high homology.</u> In general, for nucleic acid sequences, homology percentages of 90% or higher guarantee sufficient cross-reactivity to be relied upon in diagnostic tests utilizing stringent conditions of hybridisation.

*Id.* at col. 3:26-36 (emphasis added).  That is, the specification teaches that a diagnostic test for hMPV should be done with the portion of the hMPV genome that has the highest amino acid or nucleic acid homology to all hMPV isolates, or other *metapneumovirus* within the subfamily Pneumovirinae.  The specification teaches that this portion is the N-protein and its respective nucleic acid sequences:  "In Paramyxoviridae, the N protein is the most abundant protein, and the immune response to this protein occurs early in infection."  *Id.* at col. 33:54-56.  Additionally, the '206 patent specification teaches that the N protein is upwards of 88% similar to a similar virus (avian *pneumovirus* C), but only about 7-11% similar to other viruses in its subfamily:

> <u>As shown, the first gene in the genomic map of MPV codes for a 394 amino acid (aa) protein and shows extensive homology with the N protein of other *pneumoviruses*.</u> The length of the N ORF is identical to the length of the N ORF of APV-C (table 5) and is smaller than those of other paramyxoviruses (Barr et al., 1991). <u>Analysis of the amino acid sequence revealed the highest homology with APV-C (88%), and only 7-11% with other paramyxoviruses (Table 6).</u>

*Id.* at col. 9:36-44 (emphasis added).  The specification also admits that

> Although similarities are highest within a virus family, these regions are highly conserved between virus familys. In all three regions MPV revealed 97% aa sequence identity with APV-C, 89% with APV-B, 92% with APV-A, and 66-73% with RSV and PVM. <u>The region between aa residues 160 and 340 [which is in the N protein gene] appears to be highly conserved among *metapneumovirus*es</u> and to a somewhat lesser extent the Pneumovirinae (Miyahara et al., 1992; Li et al., 1996; Barr et al., 1991). This is in agreement with MPV being a *metapneumovirus*, <u>showing 100% similarity with APV-C.</u>

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

*Id*. at col. 38:45-63 (emphasis added). Elsewhere in the specification, the other proteins of the hMPV genome are described as being useful in "phylogenetic analyses," *e.g.*, for determining how the hMPV virus is related to other viruses, but it is the N protein that is called out for diagnostic assays.

In addition, clearly, the pre-emption of using a single gene (or even two), as held by the Federal Circuit in *In re BRCA1- and BRCA2-*, is sufficient to allow the claim to fall under 35 U.S.C. §101. In short, the claims of the '206 patent pre-empt the use by others of the parts of the hMPV genome that are useful in diagnostics and testing for the virus itself.

### F.    Any Request for Leave to Amend the Complaint Would Be Futile.

Should ViroNovative request leave to amend its complaint, its request should be denied as futile. Where there is no patentable subject matter, courts have found it appropriate to enter judgment and dismiss the action. *See Internet Patents Corp. v. Gen. Auto. Ins. Servs., Inc.*, 29 F. Supp. 3d 1264, 1270 (N.D. Cal. 2013) (granting motion to dismiss with prejudice and entering judgment where there was no patentable subject matter); *Genetic Techs. Ltd. v. Lab. Corp.*, 2014 WL 4379587, at *14 (recommending that the district court "simultaneously order Plaintiff to provide notice as to whether any other claims of the patent-in-suit will be asserted here, or whether the case should be closed" after granting motion).

No amendment by ViroNovative can change the words of the claims, or the specification. GenMark has shown that the claims of the '206 patent do not recite patentable subject matter, because they claim a natural phenomenon and a few well-known, common method steps. The specification itself admits that the additional method steps were well-known in the art. ViroNovative cannot find patentable subject matter in the '206 patent by merely amending its complaint. Thus, any request for leave to amend would be futile, and this court should dismiss the action.

### VI.    CONCLUSION

The holding in *Prometheus* makes clear that this complaint must be

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA

dismissed without leave to amend.

Dated:        March 2, 2015              MORGAN, LEWIS & BOCKIUS LLP


                                        By ____s/Daniel Johnson, Jr._____
                                           Daniel Johnson, Jr.
                                           Attorneys for Defendant
                                           GENMARK DIAGNOSTICS, INC.
                                           E-mail:  djjohnson@morganlewis.com

DB2/ 25755926.3

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

DEFENDANT'S MEMO OF POINTS AND
AUTHORITIES ISO ITS MOTION TO
DISMISS; CV 15-0021 DMS-JMA